## UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF CONNECTICUT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| GLENN R. CARLSON and | \* | |
| NANCY E. CARLSON, | \* | |
| Plaintiffs | \* | |
| | \* | Civil Action No. |
| v. | \* | 3:15-cv-01045 (MPS) |
| | \* | |
| ALLSTATE INSURANCE COMPANY, | \* | January 19, 2017 |
| Defendant | \* | |
| | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NOW COME the plaintiffs, Glenn R. Carlson and Nancy E. Carlson (hereinafter collectively referred to as "the Carlsons"), and submit the following Memorandum of Law in Opposition to the defendant, Allstate Insurance Company's (hereinafter "Allstate"), Motion for Summary Judgment.

## STATEMENT OF FACTS

The Carlsons built their home at 399 North Road, Ashford, Connecticut in 1991. (Ex. AA, p. 11). The concrete used to construct the basement walls of the home was most likely supplied by the JJ Mottes Company. (Ex. AA, p. 37-38). The Carlsons had noticed what they believed to be minor cracking in the basement walls of their home during the years since construction, however, the Carlsons perceived no problems with the basement walls of their home until late summer of 2014. (Ex. AA, p. 36-37, 42; Ex. BB, Ans. to Int. #9, p. 5). Initially the Carlsons assumed that the cracking they had observed, which was hairline in nature and

ORAL ARGUMENT REQUESTED

mostly vertical in orientation, was normal.  (Ex. AA, p. 32-33; Ex. BB, Ans. to Int. #9, p. 5).  In 2014, the Carlsons had begun hearing rumors concerning the growing problems with crumbling concrete in the area.  (Ex. AA, p. 36-37).  The Carlsons began to pay more attention to this previously unconcerning cracking and discovered that some of the cracks they had observed had widened.  (Ex. BB, Ans. to Int. # 9, p. 5).  In response to discovering the change in the cracking, the Carlsons consulted with their neighbor, the contractor who installed their concrete basement walls, which contractor informed the Carlsons that they may have an issue with the concrete basement walls of their home.  (Ex. AA, p. 59; Ex. BB, Ans. to Int. # 9, p. 5).

With their concerns heightened by their neighbor, the Carlsons continued to investigate the potential problem by engaging an engineer.  (Ex. AA, p. 59-60).  James L. Silva, P.E., came to the Carlsons home in September of 2014 to perform a visual inspection of the cracking condition.  (Ex. AA, p. 60-61; Ex. CC, p. 6, 11-12).  Mr. Silva performed a visual inspection of the Carlsons' basement walls and, some months later, provided the Carlsons with a report of his findings.  (Ex. AA, p. 64; Ex. CC, p. 11-12: Ex. DD, Ex. 1).  Mr. Silva diagnosed the cause of the cracking as an external sulfate attack.  (Ex. DD, Ex. 1, p. 1).  Mr. Silva informed the Carlsons that there are no known means of reversing the deterioration and that the only viable means of addressing the problem would be complete removal and replacement of the basement walls.  (Ex. CC, p. 11-12; Ex. DD, Ex. 1).  Prior to receiving Mr. Silva's report, the Carlsons were unaware that they had a significant problem with their concrete basement walls.  (Ex. AA, p. 64-65).  As a result of the information provided by Mr. Silva, the Carlsons began to solicit estimates for remediation of the condition and notified Allstate of their claim.  (Ex. AA, p. 65).

The Carlsons insured their home with successive one (1) year insurance policies issued

by Allstate at all times since the home was constructed in 1991.  (Ex. A, ¶ 4; Ex. AA, p. 41).

The homeowner's policies issued by Allstate provide coverage for the collapse of a building

structure or part of a building structure caused by, among other perils, hidden decay or use of

defective materials in construction.  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p.

15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).   The policies issued by

Allstate do not define the term "collapse."  (Ex. A, Ex. 1, form AP472, Additional Protection ¶

11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).

The Carlsons reported the claim at issue to Allstate on or about March 31, 2015.  (Ex.

AA, p. 66, 69-70; Ex. DD, Ex. 2).   Allstate first dispatched a field adjuster to make a visual

inspection of the damage reported by the Carlsons.  (Ex. AA, p. 72).   The adjuster gave the

Carlsons an immediate opinion that the claim would not be honored by Allstate.  (Ex. AA, p. 72).

Despite this initial coverage position, Allstate elected to dispatch an engineer to inspect the

property and make findings.  (Ex. AA, p. 73).  Allstate's engineer authored a report dated June

12, 2015, which report was transmitted directly to Allstate.  (Ex. DD, Ex. 3).  Allstate's engineer

found much of the basement wall system structurally deficient and recommended removal and

replacement of the majority of the basement wall system.  (Ex. DD, Ex. 3, p. 1-2).  Allstate

denied coverage by way of letter dated June 19, 2015, on the grounds that its engineer had

determined that the damage was caused by poor quality concrete which deteriorated over time.

(Ex. C, Ex. A).  In its denial letter, Allstate cited a number of additional exclusions not related to

the defective materials used to construct the basement walls of the home or the fact that the

damage was the culmination of a long term process of chemical decay.  (Ex. C, Ex. A).

Following Allstate's denial of the Carlsons' claim for coverage, the basement walls were

- 3 -

inspected by David Grandpré, P.E., on July 16, 2015.  (Ex. DD, Ex. 4, Ex. A, p. 1).   Mr. Grandpré found that the structural integrity of the Carlsons' basement walls was, at the time of his inspection, substantially impaired.  (Ex. DD, Ex. 4, Ex. A, p. 4).  The extensive pattern of horizontal and vertical cracking and deterioration throughout the basement wall structure suggests one of two (2) possible chemical reactions, an alkali-silica reaction or the oxidation of iron sulfide minerals in the aggregate used to make the concrete.[1]  (Ex. DD, Ex. 4, Ex. A, p. 3-4). Both reactions occur within the concrete on a microscopic level and cause the concrete to break down internally.  (Ex. DD, Ex. 4, Ex. A, p. 3-4).  At the time of the Grandpré inspection, the concrete was so impaired that the basement walls could not be relied upon to perform their intended functions of supporting the wooden portion of the home.  (Ex. DD, Ex. 4, Ex. A, p. 4). Mr. Grandpré has further opined that the chemical reaction cannot be arrested and that the only viable remedy to this condition is the complete removal of the basement walls and replacement with new walls formed with good and sufficient concrete.  (Ex. DD, Ex. 4, Ex. A, p. 5).  The Carlsons have since followed the recommendation of the engineers consulted to evaluate the structural condition of their home and have removed and replaced their concrete basement walls in their entirety.  (Ex. BB, Ans. to Int. # 6. p. 3-4; Ex. CC, p. 11-12; Ex. DD, Ex. 1, p. 4; Ex. DD, Ex. 3, p. 2; Ex. DD, Ex. 4, Ex. A, p. 5).[2]

## **ARGUMENT**

The Carlsons suggest that Allstate has not met its burden with respect to the summary judgment sought.  Rather, the Carlsons suggest that the record on summary judgment clearly

---

[1] The precise chemical reaction at work in the Carlsons' home has since been identified as oxidation of iron sulfide minerals.  (Ex. D, Ex. 4).

[2] Admittedly, Allstate's engineer, Brian Aguirre, P.E., did not recommend complete replacement of all of the concrete basement walls.  However, Mr. Aguirre, did recommend that the majority of the concrete basement walls be removed and replaced.  (Ex. DD, Ex. 3, p. 2).

shows that there has been a collapse of the basement walls of their home, which collapse was caused by a covered peril.  To the extent that the record does not clearly demonstrate such a covered collapse, this lack of clarity arises from factual issues that must be resolved by a jury – precluding summary judgement.  Furthermore, the record on summary judgment suggests that Allstate acted in bad faith and in violation of Connecticut's various consumer protection statutes in denying the Carlsons' claim for coverage and forcing them to litigate for the benefits of the insurance they purchased from Allstate.

I.    **Standard for Ruling on a Motion for Summary Judgment.**

Allstate's representation of the standard used when ruling on a motion for summary judgment is largely complete.  However, the Carlsons wish to offer some clarifications to Allstate's recitation.  Allstate, as the moving party, has the burden of proving that it is entitled to summary judgment.  *United Transp. Union v. Nat'l R.R. Passenger Corp,* 588 F.3d 805, 809 (2d Cir. 2009).  To meet this burden, the moving party must demonstrate that there are no genuine issues of material fact.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  It is only when the movant satisfied this burden that a "limited burden of production shifts to the nonmovant."   *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014).   In determining whether the movant has sustained its burden of demonstrating an absence of factual issues, "the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought."   *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).

"When ruling on a motion for summary judgment, the court must respect the province of the jury."  *Cobb v. Metro-North R. Co.,* 41 F.Supp.3d 145, 149 (D.Conn. 2014).   Therefore,

when deciding a motion for summary judgment the court must not decide issues of fact.  *Id.* *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986).  "It is well-established that '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of the judge.'"  *Id.*   "Thus, the trial court's task is 'carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined ... to issue-finding; it does not extend to issue-resolution.'"  *Id. citing Gallo Prudential Residential Services, Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir. 1994).

## II.     **Standard for Insurance Policy Interpretation.**

The standards for construing the terms of an insurance policy in Connecticut are clear. Construction of an insurance policy involves a determination of the parties' intent as expressed by the policy language.  *Conn. Ins. Guar. Ass'n v. Fontaine,* 278 Conn. 779, 784 (2006). However, when performing this analysis, the court must construe the policy terms "as laymen would understand them and not according to the interpretation of sophisticated underwriters." *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009).   In particular, "the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view."  *Id.*

Where policy terms are unambiguous those terms are accorded their natural and ordinary meaning.  *Jacaruso v. Lebski,* 118 Conn. App. 216, 233 (2009).  However, where a term is susceptible to more than one reading, the term is construed against the insurance company as they drafted the policy terms.  *New London County Mut. Ins. Co. v. Zachem,* 145 Conn. App. 160, 166 (2013).  Ambiguous insurance policy terms are not only construed against the insurance

company, they are construed in favor of coverage.  *Middlesex Ins. Co. v. Mara,* 699 F.Supp.2d 439, 446-447 (D.Conn. 2010); *Beach v. Middlesex Mut. Assurrance Co.,* 205 Conn. 246, 249-250 (1987).

III.    **There is Coverage Under One or More Policies Issued by Allstate Because an Insured Building Structure Collapsed.**

The Carlsons suggest that the threshold question in this case is whether there has been a "collapse" of a building structure or part of a building structure such that the collapse coverage provided by the Additional Protection section of the homeowner's policy would be triggered. The Carlsons, like many with homes affected by the JJ Mottes concrete, have looked to their homeowner's insurance carriers for coverage under the "collapse" coverage present in most homeowner's insurance policies issued in the state of Connecticut.   The policies issued by Allstate to the Carlsons do provide coverage for the collapse of a building structure or any part of a building structure, provided that the "collapse" is caused by one of the enumerated perils.[3] (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).

The question of collapse has both factual and legal elements.  Although Allstate fails to acknowledge the extent of the deterioration, there is no real question but that the concrete walls of the basement of the Carlsons' home have decayed and broken apart in a manner completely uncharacteristic of ordinary concrete.  (Ex. DD, Ex. 4, Ex. A, p. 3-4).  After inspection of the condition, the Carlsons' engineering expert, David Grandpré, concluded that the "concrete basement walls [of the Carlsons' home] were substantially structurally impaired."  (Ex. DD, Ex.

---

[3] The majority of the homeowner's policies issued by Allstate to the Carlsons define the term "Building Structure" as "a structure with walls and a roof."  (Ex. A, Ex. 1, form AP472, Definitions ¶ 5, p. 3).  The initial policies issued by Allstate to the Carlsons did not define the term "Building Structure."  (Ex. A, Ex. 2, form AU1174, Definitions, p. 3-4).

4, Ex. A, p. 4).  Furthermore, Mr. Grandpré found that the cracking and bulging present in the walls "show that portions of the concrete basement walls have structurally failed."  (Ex. DD, Ex. 4, Ex, A, p. 4).  Grandpré opines that the extensive pattern of horizontal and vertical cracking and deterioration throughout the wall structure suggested one of two (2) possible chemical reactions, an alkali-silica reaction or the oxidation of iron sulfide minerals in the aggregate used to make the concrete.  (Ex. DD, Ex. 4, Ex. A, p. 3-4).  Both reactions occur within the concrete on a microscopic level, which causes the concrete to break down internally.  (Ex. DD, Ex. 4, Ex. A, p. 3-4).  Petrographic analysis has confirmed that the precise reaction at issue is the oxidation of iron sulfide minerals.  (Ex. D, Ex. 4).  However, irrespective of the precise reaction occurring, the end result has been that the concrete of the basement walls had become so impaired that portions of those basement walls had structurally failed and that the basement walls could no longer be relied upon to perform their intended functions of supporting the wooden portion of the home.  (Ex. DD, Ex. 4, Ex, A, p. 4).

The evidence further suggests that this collapse was the result of a covered cause.  The homeowner's policy issued by Allstate provides coverage for the collapse of a building structure or any part of a building structure, provided that the collapse is "caused by one or more of the following…b. Hidden decay of the building structure…f. Use of defective methods or materials in construction, repair, remodeling, or renovation."[4]  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).  The chemical reaction occurring within the walls of the home is not only a form of hidden decay, but

---

[4] The initial policies issued by Allstate to the Carlsons between 1991 and 1995 required that a collapse caused by materials and methods in construction occur during the process of construction.  (Ex. A, Ex. 2, form AU1174, Additional Protections ¶ 12, p. 17).  Whereas the later policies did not have such a requirement.  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15).

also the result of improper materials used in the construction of the basement walls.[5]  (Ex. DD, Ex. 4, Ex. A, p. 3-4).

In light of the severely compromised physical condition of the basement walls, the legal element arises as to whether a "collapse" has occurred.  Admittedly, there was not the kind of catastrophic "tumbling down" or "falling down" that one often associates with the word "collapse."  Although in other cases, insurers have argued that a "collapse" sufficient to invoke policy coverage must involve a catastrophic "falling down," the majority of the courts construing homeowner's policy usage of the term have disagreed.  The Supreme Court of Connecticut stands in the foreground of that majority, having ruled in 1987 that collapse coverage should be afforded where there has been a "substantial impairment of the structural integrity of a building." *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 252 (1987).

The reasoning behind the court's conclusion is straight-forward.  To require an owner who knows of a substantial impairment to the integrity of the insured structure to await complete, catastrophic destruction before losses are to be covered would subvert the insured's duty to mitigate damages and avoid economic waste.  *Id.* at 253 n.2.  Certainly, the word "collapse" can be thought of as a sudden and complete catastrophe, but it is also defined as a "breakdown in vital energy, strength or stamina…"  *Beach v. Middlesex Mut. Assurance Co.*, 205 Conn. 246, 250 (1987) *citing* Webster, Third New International Dictionary.  The *Beach* Court acknowledged that "collapse" could be defined either as a sudden event or a gradual breakdown of a structural strength.  *Id.*  In either case, under common principles of insurance law, the insurer would have

---

[5] Allstate's expert engineer does not agree that the structural integrity of the basement walls of the home has been substantially impaired, however, he does agree that the pattern cracking condition is associated with defective materials used in the construction of the basement walls of the home.  (Ex. B, Ex. A, p. 11-12).

the obligation to define collapse as a catastrophic event, if that was the meaning it sought to convey. *Id.* at 251. Allstate made no attempt to define the term "collapse" in the policies issued to the Carlsons. (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).

Combining the factual description reported by Grandpré, with the *Beach* definition of collapse, the conclusion seems inescapable that the building or a part of the building had collapsed by late summer of 2014 – when the Carlsons consulted with Mr. Silva – and certainly by July 16, 2015 when Mr. Grandpré inspected the premises. (Ex. DD, Ex. 4, Ex, A, p. 1). Nowhere in the policy are the basement walls excluded from the definition or meaning of the word "building structure." (Ex. A, Ex. 1, form AP472, Definitions ¶ 5, p. 3; Ex. A, Ex. 2, form AU1174, Definitions, p. 3-4). The deterioration of the basement walls impaired the structural integrity of not only the walls themselves, but also implicated the integrity of the building as a whole. (Ex. DD, Ex. 4, Ex., A, p. 4). Furthermore, Allstate does not appear to offer in its arguments a contradictory opinion with respect to the structural integrity of the Carlsons' home in support of its motion for summary judgment.[6] Of course, use of this contradictory opinion for that purpose would only serve to create a material issue of fact precluding summary judgment as to the issue of collapse.

Allstate does suggest that *Beach* is not controlling because its policies state that a collapse is not "settling, cracking, shrinking, bulging, or expansion." (Ex. H, Ex. 1, form AP472, ¶ 11, p. 15; Ex. H, Ex. 2, form AP2, ¶ 11, p. 14; Ex. H, Ex. 3, form AU1174, ¶ 11, p. 17).

---

[6] In fact, Allstate has attached its engineering expert's report to its motion for summary judgment. Which report suggests that the structural integrity of the Carlsons' home has not been impaired. (Ex. B, Ex. A, p. 12). However, Allstate does not appear to offer this report in an attempt to contradict Mr. Grandpré's analysis of the home's structural integrity.

However, the notion that this slight difference in the policy language contained in the Allstate policy is so markedly different that *Beach* does not apply has been rejected by this Honorable Court in *Bacewicz*. The policy in *Bacewicz* contained a similar collapse provision to that found in the Allstate policies, which provision also contains the language stating "[c]ollapse does not include settling, cracking, shrinking, bulging or expansion." (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17); *Bacewicz v. NGM Ins. Co.,* 2010 WL 3023882, *6 (D.Conn. 2010). This Honorable Court properly applied the *Beach* standard, even in light of this slightly different policy language, noting that "[l]ike the contract language at issue in the *Beach* case, the Bacewiczes' policy excludes "settling, cracking, shrinking, bulging, or expansion" from its definition of 'collapse.'" *Id.* This Honorable Court found that even in light of this differing policy language the collapse provision is reasonably susceptible to more than one interpretation. *Id.* This Honorable Court suggested that it is not the presence of a crack or a bulge that makes for a "collapse," but rather culmination of a covered peril resulting in a substantial impairment of the structural integrity of the insured building that is treated as a "collapse." *Id.* In so finding, this Honorable Court noted that "it is difficult—if not impossible—to imagine any 'collapse' that did not at some point manifest itself in the form of cracks, bulges, or other physical deformities." *Id.* Accordingly, the Carlsons suggest that the *Beach* standard is applicable to their claim and that this Honorable Court should judge the presence or absence of a covered "collapse" under this standard.

IV.     **The Provision Requiring Damage to be "Sudden and Accidental" is Ambiguous in the Context of "Collapse" Coverage.**

Allstate spends little time analyzing whether there has been a "substantial impairment" to the structural integrity of the Carlsons' home, such that a covered collapse has occurred. Rather,

Allstate points to policy language which requires that a collapse must be "sudden and accidental" as grounds for suggesting that the damage to the Carlsons' home is not covered, even if a substantial impairment has occurred.  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).  Allstate then points to various pieces of testimony – including portions of the testimony offered by the Carlsons' expert engineer, David Grandpré – which rightfully establish that the chemical reaction causing the decay of the Carlsons' home is gradual in nature.  Allstate then states that because the chemical process is gradual, the loss was not sudden, and no coverage may be had.  The Carlsons suggest that the matter is not as cut and dry as Allstate suggests.

At the outset, Mr. Grandpré's analysis of the gradual nature of the chemical reaction that occurred within the concrete basement walls of the Carlsons' home is not as straightforward as portrayed by Allstate.  There is little doubt that the chemical reaction that caused the damage to the Carlsons' home occurs over years and is gradual in nature.  The portions of Mr. Grandpré's testimony cited by Allstate on that point is clear.  What is omitted from Allstate's recitation of Mr. Grandpré's testimony is his opinion that the gradual reaction can cause sudden events throughout the course of the deterioration.   (Ex. EE, p. 44-45).  As the chemical reaction progresses, and the wall weakens, sudden events such as "the wall going from being straight and plumb to shifting inward some increment, or to pieces of the concrete within the wall falling to the floor."  (Ex. EE, p. 44-45).  The record suggests that such sudden events had occurred in the Carlsons' home, in that the pieces of concrete had fallen to the floor and, more significantly, that more than one wall had shifted inward by some increment.  (Ex. DD, Ex, 4, Ex. A, p. 3, Photo 14, Ex. EE, p. 45, 48, 50).  While the chemical degradation within the concrete was gradual, the

record suggests that this gradual degradation has resulted in a series of sudden events that resulted in the poor structural condition of the home prior to the removal and replacement of the basement walls.  Respectfully, in light of these opinion, a reasonable jury could find that the overall structural condition at the time that the Carlsons' submitted their claim to Allstate was the result of a series of sudden events, though ultimately driven by a long term chemical reaction.

Even so, the Carlsons suggest that Allstate's proffered interpretation is unreasonable as it would serve to render the coverage supplied the "collapse" provision hollow.  Respectfully, the term "sudden," as found in Allstate's policy is inconsistent with the definition of "collapse" that has been supplied by the Connecticut Supreme Court.  As mentioned above, where the term "collapse" is not explicitly defined by the insurance policy – as is the case here – the Connecticut Supreme Court has explicitly rejected the notion that a "collapse" must involve a sudden or catastrophic event.  *Beach v. Middlesex Ass. Co.*, 205 Conn. 246, 252 (1987).  To the contrary, the Connecticut Supreme Court stated unequivocally that a "collapse" occurs where the structural integrity of the building becomes substantially impaired.  *Id.*  In so defining "collapse," the Connecticut Supreme Court accepted as more persuasive the reasoning of those cases finding that "collapse" should mean "substantial impairment" because requiring an insured to wait for a sudden or catastrophic falling down would be "economically wasteful," to say nothing of the potential for injury or death resulting from such a calamity.  *Id.* at 253 n.2.  The *Beach* Court also based its decision to define "collapse" as "substantial impairment" because waiting a calamitous event would conflict with the insured's duty to mitigate damages.  *Id.*  Allstate's attempt to impose the characteristic of suddenness to its collapse provision is so inconsistent with the Connecticut Supreme Court's supplied definition of the term "collapse," and the reasoning upon

which that court supplied definition was based, that it would render coverage for the substantial impairment of the structural integrity of a building hollow.   Therefore, Allstate's proffered interpretation of the "collapse" provision should be rejected.

There is a second layer of inconsistency to Allstate's proffered policy interpretation that emanates not from case law, but from the policy language itself. The purported blanket exclusion for all gradually occurring "collapses" is antithetical to most of the events purportedly covered by the section.   In fact, the majority of the specifically enumerated perils covered by the "collapse" provision contemplate damage occurring over a period of time.   Homeowners faced with the JJ Mottes concrete typically look to two (2) of the enumerated "collapse" perils when seeking coverage – hidden decay or defective materials used in construction.  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).  "Decay" is a process which, by definition occurs over a period of time. *See* Webster's New World College Dictionary, 1997, which defines "decay" as "to lose strength, soundness, health, beauty, prosperity, etc. *gradually."*  (emphasis added).  Similarly, by allowing coverage for a "collapse" due to defective materials used in construction that occurs *after* the completion of such construction, the policy contemplates damage stretching over the useful life of a building.  Furthermore, a "collapse" is also covered by the policy if it is the result of hidden vermin or insect damage.  (Ex. A, Ex. 1, form AP472, Additional Protection ¶ 11, p. 15; Ex. A, Ex. 2, form AU1174, Additional Protection ¶ 12, p. 17).  Respectfully, insect and vermin damage does not cause either a substantial impairment to the structural integrity of a building, much less a catastrophic falling down of a building, in the short term, but rather, such damage would only impact a structure to the point of collapse gradually over a period of time.  As such covered

- 14 -

perils for "collapse" are clearly contemplated to be gradual in nature, the policy interpretation proffered by Allstate seems quite inconsistent with the intent of the coverage provided.

The notion that the term "sudden" renders the "collapse" provision ambiguous has been accepted by at least one (1) other court with the occasion to address this specific issue. *See Kelly v. Balboa Ins. Co.,* 897 F.Supp.2d 1262, 1268 (M.D. Fla. 2012). The *Kelly* court construed the phrase "sudden and accidental" in the context of a collapse provision similar to the one at issue in this motion.[7] *Id.* The Court found that the term "sudden" rendered the provision ambiguous because the enumerated perils of "hidden decay" and "hidden insect or vermin damage" occur over a period of time "by their very nature." *Id.* The Court then found that the inclusion of the term "sudden" in a provision providing coverage for long term perils such as hidden insect damage, rendered the whole provision ambiguous. *Id.* The Court then construed the provision against the insurer to find that a "collapse" need not be "sudden" where it is caused by hidden decay or hidden insect damage. *Id.* The Carlsons suggest that this decision is well reasoned and that this Honorable Court should construe the collapse provision against the insurer and in favor of coverage by finding that a collapse caused by those perils that naturally occur gradually need not be "sudden."

These sentiments were also expressed by the Second Circuit Court of Appeals, in construing collapse coverage in general. In *Dalton* the Court rejected the notion that a collapse must involve a "sudden destructive force" is inconsistent with the enumerated collapse perils of hidden decay and hidden insect or vermin damage. *Dalton v. Harleysville Worcester Mut. Ins.*

---

[7] Like Connecticut, Florida has interpreted the term "collapse" to mean a substantial impairment of a structure. *Kelly v. Balboa Ins. Co.,* 897 F.Supp.2d 1262, 1268 (M.D. Fla. 2012) *citing Auto Owners Ins. V. Allen,* 362 So.2d 176, 178 (Fla. 2d DCA 1978).

*Co.,* 557 F.3d 88, 93 (2d Cir. 2009).   The Court explained that "[b]y their very nature, hidden decay and hidden insect or vermin damage occur slowly and not as a sudden destructive force."  *Id.*   Therefore, the Court found that even if a collapse loss may typically require some sudden event, "that is surely not the case where the policy in question defines collapse in a manner which expressly includes conditions that occur only slowly."  *Id.*

In contrast, Allstate cites to the *Buell* case, which construed the phrase "sudden and accidental," not in connection with the "collapse" provision in a standard homeowner's insurance policy, but rather, in the context of a pollution exclusion found in a commercial general liability policy.  The Carlsons suggest that because of the inherent gradual nature of the majority of the enumerated "collapse" perils, the reasoning of *Buell* bears little applicability to the policy language at issue.  The *Buell* Court construed the term "sudden and accidental" in the context of an exception to a commercial general liability policies exclusion for bodily injury resulting from pollution.  *Buell Indus. Inc. v. Greater New York Mut. Ins. Co.,* 259 Conn. 527 (2002).  The policy at issue in the case excluded coverage related to pollution, but did provide limited coverage where the discharge of the pollution was "sudden and accidental."  *Id.  Buell* was well reasoned in the context of pollution as the damage or event is the same in either event – the discharge of pollution – but that it was only the circumstances of the discharge that affected the issue of coverage.  This prompted the Court to find that a temporal element of abruptness was necessary to meet coverage, otherwise the term "sudden" would be superfluous and there would be potential coverage for pollution occurring over a long period.  *Id.* at 540-541.  We are dealing here with entirely different policy language where the application of a temporal quality would render the coverage provided a sham.

Whereas pollution can occur due to a sudden or a gradual release of pollutants, there is no "sudden" type of decay. Nor is a collapse caused by defective materials, where that collapse may occur any time after construction, necessarily sudden. To impose the same temporal quality found in the pollution coverage analysis on the "collapse" provision, with its gradually occurring enumerated perils, would serve only to render coverage under the "collapse" provision a nullity. Such a construction should not be imposed by the court. *Northrop v. Allstate Ins. Co.*, 247 Conn. 242, 251, (1998). To impose such a construction on this insurance policy would serve only to lull the layman into a false sense of security, by believing that "collapse" due to long term perils will be covered when, by the use of inconsistent terminology, Allstate is free, after the claim has been filed, to deny coverage for gradual losses. The Carlsons suggest that any lay insured would rightfully and reasonably believe that terms such as "decay" contemplate gradual damage and that this reasonable expectation should be protected. *Vermont Mut. Ins. Co. v. Walukiewicz,* 290 Conn. 582, 592 (2009); (Ex. CC, p. 19).

Allstate attempts to bolster its arguments with respect to the term "sudden" by reference to two district court cases involving policies with materially different collapse provisions. The more salient of the two, due to the fact that it was decided by this Honorable Court, is the case of *Alexander v. General Ins. Co.* The *Alexander* matter involved policy language so distinct from that in this matter as to render it completely irrelevant to the analysis of the Allstate policies. The policies at issue in *Alexander* contained an exhaustive definition of the term "collapse," which the Court construed as excluding coverage for the plaintiffs' claim and rendering those policies outside of the rule expressed in *Beach.* The policy definition of the term "collapse" at issue in *Alexander* provides:

> "a. With respect to this additional coverage:
> 1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.
> 2) A building or any part of a building that is in danger of falling down or caving is not considered to be in a state of collapse.
> 3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.
> 4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion."
> Ex. DD, Ex. 5, Form HOM-7030/EP R2 1/09, p. 10, ¶ 11.

Contrary to Allstate's assertion, it is clear that the policies at issue in *Alexander* contain a materially different collapse provision from that found in the Allstate's policies at issue in this matter.

As a result of this materially different policy language, Allstate's analysis of that case is plainly irrelevant to this matter.  Allstate points to the portions of the *Alexander* decision where Judge Underhill considered whether the term "caving in" was ambiguous in the context of the structural failure mechanisms displayed by the plaintiffs' home.  Unlike the policy in *Alexander,* however, Allstate's policy does not define the term "collapse" and therefore, whether or not a "caving in" has occurred in this instance is of no consequence.  In fact, the very exchange cited by Allstate on page 15 of its memorandum is clear that Judge Underhill's opinion in that matter turned on whether an event occurred that satisfied the collapse definition's requirement of a falling down or caving in.  As this matter does not involve the collapse definition at issue in *Alexander* that opinion offers little instruction in this case.  Certainly a falling down of a structural element would be abrupt by its very nature, however, as discussed more fully above,

there need not be a falling down under Allstate's policy as collapse occurs where there is a substantial impairment to structural integrity.

Much the same may be said of the *Nestani* matter cited by Allstate in support of its interpretation of the term "sudden." The policy at issue in *Nestani* also involved a specific definition of collapse that is lacking in the Allstate policy, providing that "[c]ollapse means actually fallen down or into pieces." *Ass'n of Unit Owners of Nestani v. State Farm Fire and Cas. Co.,* 670 F.Supp.2d 1156, 1162 (D. Or. 2009). The Carlsons suggest that this distinction is material, particularly in reference to the Ninth Circuit's treatment of the matter on appeal. The Ninth Circuit affirmed the District Court's analysis on the grounds that the conclusion that no collapse had occurred was appropriate given the policy definition of the term. *Ass'n of Unit Owners of Nestrani-A Grecian Villa v. State Farm Fire and Cas. Co.,* 434 Fed.Appx. 579 (9th Cir. 2011). The Ninth Circuit agreed with the District Court's determination that no event meeting the definition of "collapse" had occurred and that the state of the insured structure was one of impairment, which was insufficient under that particular collapse provision. *Id.* Importantly, the Ninth Circuit declined to review the District Court's reasoning as to the term sudden as it was able to affirm the decision solely interpretation of the collapse definition. As a result, the Carlsons suggest that this matter is distinguishable and uninstructive.

## V.   The Carlsons Have Asserted a Viable Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing.

Allstate attempts to paint its denial of the Carlsons' claim as nothing more than a coverage dispute between an insurer and its customers. Allstate claims that its denial was justified based upon a sampling of policy exclusions. Allstate also suggests that because its lay insureds could not themselves identify objectionable conduct, there can be no bad faith.

However, the Carlsons' claim for bad faith does not concern the defenses developed by counsel after the course of litigation, but rather the unfair and arbitrary manner in which Allstate dealt with the Carlsons during the claims process.   The Carlsons suggest that there is sufficient evidence of Allstate's dilatory actions to submit to a jury for resolution.

It is a settled point of law that every contract carries an implied duty requiring that neither party do anything to injure the right of the other party to receive the benefits of the agreement. *Renaissance Management Company, Inc. v. Connecticut Housing Finance Authority,* 281 Conn. 227, 240 (2007).  This "covenant of good faith and fair dealing presupposes that the terms and purpose of the contract are agreed upon by the parties and that what is in dispute is a party's discretionary application or interpretation of a contract term."  *Id.*  In order to constitute a breach of the covenant of good faith and fair dealing, "the acts by which a defendant allegedly impedes the rights of a plaintiff to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith."  *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.,* 269 Conn. 424, 433 (2004).

Bad faith generally implies "actual or constructive fraud, or a design to mislead or deceive another, *or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties...*"  *Id.* (emphasis added).  However, bad faith in the context of insurance may arise where an insurer has acted "unreasonably or contrary to the policy provisions, or that plaintiffs could reasonably expect to receive approval of their claim."  *Craig v. Colonial Penn Ins. Co.,* 335 F. Supp. 2d. 296, 306 (D. Conn. 2004).

The record on summary judgment suggests that Allstate acted in a dilatory manner in denying the Carlsons' claim not prompted by an honest mistake as to its rights and duties.

Allstate suggests that there can be no bad faith because, irrespective of whether the damage constitutes a collapse, Allstate had a good faith basis for denying the claim based upon policy exclusion for damage involving "wear and tear, aging, marring, scratching, deterioration, inherent vice, latent defect," "rust or other corrosion," "settling, cracking, shrinking, bulging, or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings," as well as "faulty, inadequate or defective…materials used in repair, construction, renovation or remodeling."  (Ex. C, Ex. A, p. 1-2).  The Carlsons respectfully disagree with this notion.

The Carlsons had alleged that Allstate had failed to conduct a proper investigation of the claim.  It is now clear that Allstate did conduct an investigation by retaining an engineer to conduct an inspection and analysis of the property.  Setting aside the fact that simply because Allstate conducted an investigation, that investigation may not necessarily proper, the heart of the Carlsons' claim for bad faith is the allegation that Allstate relied upon clearly inapplicable policy exclusions to deny their claim in an attempt to mislead them into concluding that the claim was not covered.  (First Amended Complaint, ECF No. 7, ¶ 26-29).  Such a theory of breach of the implied covenant of good faith and fair dealing has been upheld by this Honorable Court on a number of occasions.  *See Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 164-166 (D. Conn. 2014).[8]  The Carlsons suggest that the record on summary judgment supports this assertion.

The Carlsons submitted a claim for coverage to Allstate seeking coverage under the collapse provision, however, Allstate's denial is devoid of any reference to this coverage or any

---

[8] The *Liston-Smith* matter cited by Allstate is distinguishable in that the plaintiffs offered a different theory for breach of the implied covenant of good faith and fair dealing.  Namely, the plaintiffs in *Liston-Smith* alleged that the insurer sought out policy provisions that allowed them to deny their claim.  *Liston-Smith v. CSAA Fire and Casualty Ins. Co.,* 2016 WL 6246300, * 3 (D. Conn. 2016).  This Honorable Court found that theory of bad faith insufficient, distinguishing *Belz*, which offered a different theory of bad faith.

analysis as to why Allstate felt that no coverage was to be had under this provision.  (Ex. C, Ex. A; Ex. DD, Ex. 2).  In addition, while Allstate now points to four (4) policy exclusions that it contends applies to defeat coverage, it omits reference in its summary judgment motion to the other eleven (11) policy exclusions referred to in its denial letter.  (Ex. C, Ex. A).  Such exclusions include "[e]nforcement of any building code…," "growth of trees and shrubs, plants or lawns…," "contamination," "smog, smoke from manufacturing of any controlled substance, agricultural smudging or industrial operations," among others.  (Ex. C, Ex. A).  Respectfully, it is this type of conduct that the Carlsons assert to be unfair – the use of the insurer's relative sophistication with respect to complex policy language to justify a coverage denial to its insureds with a barrage of policy citations of little to no applicability.  Simply put, the Carlsons' claim is that Allstate, like all other insurers faced with these concrete decay claims, used superior knowledge of the policy and the knowledge that lay insureds are most likely ignorant of case law construing policy language, to mislead the insured into the belief that their claim is not covered and to discourage further pursuit of insurance benefits as fruitless.  Such conduct is clearly supported by the record in this instance.

Though Allstate did retain the services of an engineer, respectfully, the manner in which it used the engineering opinion in this matter is dilatory in and of itself.  First, Allstate now relies upon the "rust or other corrosion" exclusion as rendering coverage fairly debatable.  While it is now clear that the damage to the Carlsons' home was caused by the oxidation of iron sulfides – which may or may not be considered "rust"[9] – that condition was not diagnosed during the claim

---

[9] "Rust" is defined as "the red or orange coating that forms on the surface of iron when exposed to air and moisture, consisting chiefly of ferric hydroxide and ferric oxide formed by oxidation."  Dictionary.com/browse/rust.  As the chemical reaction at issue is the oxidation of iron sulfide, as opposed to ferric hydroxide and ferric oxide, this portion of the exclusion is not as clearly applicable.

process.  (Ex. D, Ex. 4, Ex. A, p. 4).  Allstate's engineering and petrographic analysis made no reference to such a condition, making Allstate's denial on that grounds highly dubious.  (Ex. DD, Ex. 3).  Second, while Allstate purports to base its coverage decision on the fact that the engineer determined that the deterioration affecting the Carlsons' home occurred over time, and that the damage was not "sudden and accidental," none of the policy provisions cited clearly state that damage must be "sudden and accidental" to be covered.  (Ex. C, Ex. A).  The only reference to "sudden and accidental" damage being covered is found in two (2) exceptions to the referenced exclusions, which exceptions seem to have no rational relationship to the damage at issue in the Carlsons' home.[10]  As a result, while the record certainly suggests that Allstate conducted an investigation, the Carlsons suggest that Allstate did not make fair use of the facts obtained or communicate those facts to the Carlsons in good faith.

Allstate suggests that because the Carlsons did not feel that Allstate acted inappropriately, other than by denying the claim, that there can be no bad faith.  However, that the Carlsons did not feel that Allstate's conduct was deficient is not dispositive, as most lay insureds do not have the sophistication necessary to determine whether the policy exclusions cited by Allstate were supported by the facts or law.  The Carlsons' thoughts on the claims handling process may simply suggest that the misdirection worked.  *See Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 167 n.2 (D.Conn. 2014)(noting in the context of a CUTPA/CUIPA claim that the withdrawal of a lawsuit does not negate the value of that suit in considering whether an insurer has a general business practice of denying a type of claim by suggesting that "perhaps the

---

[10] Allstate's denial letter cites the exclusion for water damage, which seems to contain an exception for "sudden and accidental" loss caused by fire, explosion, or theft resulting from water damage.  (Ex. C, Ex. A, p. 1).  Similarly, the cited exclusions from paragraph 15 of the homeowner's policy, have an exception if those cited exclusions cause the "sudden and accidental" release of water or steam from various mechanics within the home.  (Ex. C, Ex. A, p. 1-2).

unfair practice worked as planned").

Allstate calls attention to the matter of *Kim v. State Farm Fire and Cas. Co.,* 2015 WL 6675532 (D.Conn. 2015), however, the Carlsons suggest that Allstate's analysis of the case is flawed.  In *Kim,* this Honorable Court did dismiss a claim for violation of the implied covenant of good faith and fair dealing, however, *Kim* is quite distinguishable from this matter.  First, the policy at issue in *Kim* did not offer the explicit "collapse" coverage found in the Allstate policy.  While it appears that the policies at issue in *Kim* should ultimately cover the concrete decay damage, the lack of a "collapse" provision does gives rise to the potential that other policy exclusions, typically immaterial to the collapse analysis, may facially offer a legitimate basis for denial under the policy.  Setting aside the notion that Allstate did not cite or otherwise rely upon the majority of exclusions offered in *Kim,* Allstate does offer coverage for the peril of collapse, rendering the vast majority of the exclusions at play in *Kim,* and offered now in support of its motion, less facially valid.

Second, the *Kim* matter, though acknowledging that the cited exclusions appeared to be facially valid, found that the denial letter was not misleading as it took great pains to explain why the particular exclusions cited applied, at least in the opinion of the insurer.  By contrast, the Allstate denial letter makes no meaningful attempt to explain the factual basis underlying any of the cited exclusions.  While the denial letter suggests that the reason underlying the denial, that the damage was long term in nature, and not "sudden and accidental," it fails to disclose the basis in the policy requiring that damage be sudden and accidental.  Furthermore, while the letter states that "[y]our policy contains specific provisions pertaining to this loss," it fails to clearly suggest what those provisions were and why they were applicable to the facts and circumstances

of the case.  (Ex. C, Ex. A, p. 2).   Therefore, this matter is, far more analogous to the number of prior cases within the District upholding, on motion to dismiss, claims for breach of the implied covenant of good faith and fair dealing, than the *Kim* matter.  *See Metsack v. Liberty Mut. Fire Ins. Co., et al.,* 2015 WL 5797016, * 8-9 (D.Conn. 2015); *Gabriel v. Liberty Mut. Fire Ins. Co.,* 2015 WL 5684063, * 4-5 (D.Conn. 2015); *Belz v. Peerless Ins. Co.,* 46 F.Supp.3d 157, 164-165 (D.Conn. 2014); *Karas v. Liberty Mut. Ins. Co.,* 33 F.Supp.3d 110, 116-117 (D.Conn. 2014); *Panciera v. Kemper Independence Ins. Co.,* 2014 WL 1690387, * 3-4 (D.Conn. 2014).

Therefore, the Carlsons respectfully suggest that there is sufficient evidence to suggest that Allstate acted in bad faith by failing to cover their claim.  Though a jury may find that Allstate acted appropriately, the fact that it denied the claim in a manner not wholly consistent with the facts developed during the investigation and by citation to policy exclusions will little or no rational relationship the Carlsons' claim, present sufficient evidence to survive summary judgment.

## VI.  The Carlsons Have Asserted a Viable Claim for Violation of Connecticut's Consumer Protection Statutes.

The Carlsons have alleged that Allstate has failed to promptly effectuate settlement of their claim despite the fact that liability has become reasonably clear.  Conn. Gen. Stat. 38a-816(6)(f).  The Carlsons have also alleged that Allstate failed to make prompt settlement as a matter of its general business practice.  *Id.; Lees v. Middlesex Ins. Co.,* 229 Conn. 842, 847-849 (1994).   Allstate's argument against the CUIPA count focuses on whether liability is "substantially certain" and the Carlson will focus on that argument.  However, it appears from the other arguments addressed in this memorandum of law, that liability has become reasonably clear or that there are issues of fact with respect to when this clarity may have occurred.  There is

also adequate factual support for the fact that Allstate denied the Carlsons' collapse claim as part of its general business practice in handling those claims.  This Honorable Court may take judicial notice of its own dockets, which have now swelled with actions against Allstate arising from denials of coverage for the same condition affecting the Carlsons' home.[11]

By way of substantive arguments, Allstate suggests that the *Alexander* analysis applies to this matter and renders the issue of coverage fairly debatable.  First and foremost, Allstate's suggestion that the *Alexander* could have guided its coverage position is factually unsupported. Allstate's June 19, 2015 denial preceded the *Alexander* decision by over a year and, therefore, the decision could not have played any part in Allstate's coverage analysis or otherwise bolstered its policy interpretation.  (Ex. C, Ex. A).  Even so, as discussed more fully above, the *Alexander* case involved policy language so materially different from that at issue in this matter that it is inapplicable to the analysis of coverage in this matter and should not have been relied upon by Allstate in any meaningful way.  Furthermore, the *Tucker* matter cited by Allstate for the proposition that liability has to be "substantially certain" is not only distinguishable from this matter in a material way, but also, a closer examination of the cited principle undercuts Allstate's reliance on the matter.

*Tucker* involved a "claims made" policy rather than an "occurrence" policy and involved a claim that was clearly made outside of the policy period at issue and established by a previous

---

[11] *Metsack v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:14-cv-01150 (VLB); *Lees v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:15-cv-01050 (VAB); *Carney v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-00592 (VLB); *Lajeunesse v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-00937 (AVC); *Manseau v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-01231 (MPS); *Valls v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-01310 (VAB); *Pearse v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-01337 (SRU); *Adams v. Allstate Ins Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-01360 (JBA); *Rudeen v. Allstate Ins. Co., et al.,* Connecticut Federal District Court Civil Action No. 3:16-cv-01827 (MPS); *Miller v. Allstate Ins. Co.,* Connecticut Federal District Court Civil Action No. 3:16-cv-02059 (JBA).

judgment.   *Tucker v. American Intern. Group,* 2015 WL 403195 (D. Conn. 2015).   This particular factual record led to the resounding conclusion that liability had not become reasonably clear.   In a footnote, *Tucker* cited to a hornbook opinion that for liability to be reasonably clear for purposes of an unfair insurance practices statute, the existence of liability has to be substantially certain.   *Id.* at *27 n48.   By way of explanation as to when liability is substantially certain, *Tucker* referred to the similar standard found in Massachusetts law for determining whether liability is reasonably clear for the purposes of M.G.L. c. 176D – Massachusetts' iteration of the uniform unfair insurance practices act – which standard was expressed in a Massachusetts Federal District Court case.   *Id. citing Bohn v. Vermont Mut. Ins. Co.,* 922 F.Supp.2d 138, 146-147 (D. Mass. 2013).   Under the standard cited by *Tucker,* liability is reasonably clear "if a reasonable person, with knowledge of the relevant facts and law, would probably have concluded that the insurer was liable to the plaintiff."   *Bohn v. Vermont Mut. Ins. Co.,* 922 F.Supp.2d 138, 146-147 (D. Mass. 2013).   However, under this objective standard employed in Massachusetts, it is up to the "fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff."   *Demeo v. State Farm Mut. Auto Ins. Co.,* 38 Mass. App. Ct. 955, 956-957 (1995).   Therefore, the objective standard cited by *Tucker* and relied upon by Allstate is fatal to the requested summary judgment as it leaves the discernment of whether liability became reasonably clear to the jury.

## CONCLUSION

For the foregoing reasons, the plaintiffs, Glenn R. Carlson and Nancy E. Carlson, respectfully request that this Honorable Court deny the defendant, Allstate Insurance Company's, Motion for Summary Judgment.

**PLAINTIFFS,**
**GLENN R. CARLSON and**
**NANCY E. CARLSON**

By: */s/ Jeffrey R. Lindequist, Esq.*
Jeffrey R. Lindequist, Esq.
One Monarch Place, Suite 2220
Springfield, MA 01144
(413) 736-4101 – *Telephone*
(413) 736-4582 – *Facsimile*
jlindequist@mdparkerlaw.com
Federal Bar #ct29425

## CERTIFICATE OF SERVICE

I hereby certify that on January 19, 2017, a copy of foregoing Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion for Summary Judgment was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Jeffrey R. Lindequist, Esq.*