UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

GLENN R. CARLSON, and
NANCY E. CARLSON,
    Plaintiffs,

v.

ALLSTATE INSURANCE COMPANY.
    Defendant.

No. 3:15-cv-01045 (MPS)

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Glenn R. Carlson and Nancy E. Carlson (collectively, "the Carlsons" or "Plaintiffs") filed this action against their homeowner's insurance provider, Allstate Insurance Company ("Allstate"), for failure to pay for damages to their home caused by cracking concrete. Plaintiffs filed their complaint on July 8, 2015, bringing claims of breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two). (ECF No. 1.) On July 9, 2015, Plaintiffs added a claim for unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a-816 *et seq.* ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a *et seq*. ("CUTPA") (Count Three). (ECF No. 7.)

On December 15, 2016, Allstate moved for summary judgment with respect to the breach of contract claim on the grounds that the insurance policy at issue did not cover the alleged damage. (ECF No. 37.) Allstate also moved for summary judgment with respect to the remaining claims on the grounds that those claims cannot be maintained in the absence of a breach of contract claim, or, in the alternative, on the grounds that the undisputed facts do not support a claim that Allstate

1

acted in bad faith or engaged in unfair practices in connection with the Carlsons' insurance claim. (*Id*.) For the reasons set forth below, the motion is GRANTED.

## I.  Factual Background

The following facts, which are taken from the parties' Local Rule 56(a) Statements and the exhibits, are undisputed unless otherwise indicated.

The Carlsons have lived in the property located at 399 North Road, Ashford Connecticut ("the Property") since 1991. (ECF No. 42 ¶ 1.) Allstate has insured the Property under separate insurance policies ("the Policies"), each effective for a one-year term, since May 30, 1991, and continuing through July 30, 2016. (*Id*. ¶ 2.)

The Carlsons noticed cracking in their foundation walls beginning in approximately 2011 or 2012. (*Id*. ¶ 3; ECF No. 38-4 at 10.) In the fall of 2014, after hearing rumors about issues with concrete in the area, Mr. Carlson asked Irwin "Jake" Stevenson, a neighbor and the contractor who had installed the Carlson's foundation, to inspect the foundation walls. (*Id*. ¶ 4; ECF No. 38-4 at 11-12.) After inspecting the foundation walls, Stevenson told Ms. Carlson that there was a problem with the concrete. (ECF No. 42 ¶ 4) In mid-September 2014, the Carlsons hired an engineer, Silva, to inspect the foundation. (*Id*.) Silva inspected the foundation and issued a report, dated November 17, 2014, identifying "varying levels of gypsum chalking, map cracking, and concrete surface discoloration" in the foundation walls. (*Id*. ¶ 5.)

On March 31, 2015, the Carlsons submitted a claim for coverage for the damage to the concrete basement walls of their home. (*Id*. ¶ 6.) On April 10, 2015, an Allstate claims representative conducted an initial inspection of the Property. (*Id*. ¶ 7.) On April 27, 2015, an engineer retained by Allstate inspected the Property and drilled core samples from the Carlsons'

foundation walls for analysis. (*Id.*) Allstate denied the Carlsons' claim by letter dated June 19, 2015. (*Id.* ¶ 8.)

The Carlsons' Policies state, in relevant part:[1]

Losses We Cover Under Coverages A and B:

We will cover sudden and accidental direct physical loss to property described in Coverage A – Dwelling Protection and Coverage B – Other Structures Protection except as limited or excluded in this policy.[2]

(ECF No. 38-1 at 11.)

Under, "Losses We Do Not Cover Under Coverages A and B," the Policies provide:

We do not cover loss to the property described in Coverage A – Dwelling Protection or Coverage B – Other Structures Protection consisting of or caused by:

4. Water or any other substance on or below the surface of the ground, regardless of its source. This includes water or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the residence premises.
. . .
12. Collapse, except as specifically provided in Section I – Additional Protection under item 11, 'Collapse.'[3]
. . .

In addition, we do not cover loss consisting of or caused by any of the following:

15. a) wear and tear, aging, marring, scratching, deterioration, inherent vice, or latent defect;
. . .

---

[1] The Policies issued to the Carlsons from 1991 through 2016 were provided in one of two forms. From 1991 through 1995, Allstate used Form AU1774. (ECF No. 38-1 at 37.) From 1995 through 2016, Allstate used Form AP472. (*Id*. at 5.) The relevant portions of the two Forms are largely the same, except where noted in the footnotes below. Neither party contends that the minor language differences between the policies are material (*but see* footnote 9, *infra*).

[2] The 1991 – 1995 Policies provide, "We will pay for sudden and accidental *physical loss* to the property described in the Dwelling Protection coverage, except as limited or excluded in this policy." (ECF No. 38-1 at 44.)

[3] The 1991 – 1995 Policies provide, "We do not cover loss to the property described in the Dwelling Protection coverage resulting in any manner from: . . . 10. Collapse of a building structure or any part of a building structure except as provided in Section I – Additional Protection under 'Collapse'." (ECF No. 38-1 at 45.)

3

d) rust or other corrosion, mold, wet or dry rot;[4]

. . .

g) settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

. . .

22. Planning, Construction or Maintenance, meaning faulty, inadequate or defective:

. . .

b) design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
c) materials used in repair, construction, renovation or remodeling; or
d) maintenance;

of property whether on or off the residence premises by any person or organization.

(ECF No. 42 ¶¶ 9-10, 13; ECF No. 38-1 at 11-13.)[5]

Under the section titled, "Section I – Additional Protection," the Policies provide:

11. Collapse

We will cover:

a) the entire collapse of a covered building structure;
b) the entire collapse of part of a covered building structure; and
c) direct physical loss to covered property caused by (a) or (b) above.

For coverage to apply, the collapse of a building structure specified in (a) or (b) above must be a sudden and accidental direct physical loss caused by one or more of the following:

. . .

b) hidden decay of the building structure;

. . .

f) defective methods or materials used in construction, repair, remodeling or renovation.

---

[4] The 1991 – 1995 Policies exclude "rust; mold; wet or dry rot" at subsection 13(c) but do not mention corrosion. (*Id.*)

[5] The 1991 – 1995 Policies provide, "We do not cover loss to the property described in the Dwelling Protection coverage resulting in any manner from: . . . 7. One or more of the Items listed below, if that Item is one of two or more causes of a loss and if the other cause(s) of the loss is (are) excluded by this policy: . . . b) Defect, Weakness, inadequacy, fault or unsoundness in: . . . 2) design, specifications, workmanship, construction, grading, compaction; or 3) materials used in construction or repair; or 4) maintenance of any property including, but not limited to, land, structures, or improvements of any kind, whether on or off the residence premises. (ECF No. 42 ¶ 11; ECF No. 38-1 at 44-45.)

4

Collapse does not include settling, cracking, shrinking, bulging or expansion.

(ECF No. 42 ¶ 14; ECF No. 38-1 at 20.)[6]

The 1995 – 2016 Policies apply "only to losses or occurrences that take place during the policy period." (*Id.* ¶ 12.)[7]

In its denial letter, Allstate cited several provisions of the Policies as grounds for denial, including the provisions under "Losses We Do Not Cover Under Coverages A and B" excluding coverage for losses consisting of or caused by "wear and tear . . . deterioration, inherent vice, or latent defect"; "rust or other corrosion, mold, wet or dry rot"; "[w]ater or any other substance which exerts pressure on, or flows, seeps or leaks through any part of the residence premises"; and "faulty, inadequate, or defective . . . materials used in repair, construction, renovation or remodeling." (ECF No. 38-3 at 5-6.) The letter stated that an engineer retained by Allstate concluded that

> [T]he concrete is of a poor quality and has degraded over time due to the high water to cement ratio in the pour. The material strength of the concrete is deficient. This poor quality has resulted in shrinkage cracks and made the concrete permeable. The engineer finds the deterioration has been a long-term process. The failure is ongoing and not the result of a sudden and accidental loss.

(*Id.* at 6)

---

[6] With respect to "Collapse," the 1991 – 1995 Policies provide, "We will cover: a) entire or partial collapse of a covered building structure; and b) direct loss to covered property caused by the entire or partial collapse of a building structure. For coverage to apply, the collapse of a building structure specified in (a) or (b) above must be a sudden and accidental direct loss caused by one or more of the following: . . . b) hidden decay or hidden vermin damage; . . . e) defective methods or materials used in construction, repair, remodeling or renovation but only if the collapse occurs in the course of construction, repair, remodeling or renovation. Collapse does not include settling, cracking, shrinking, bulging or expansion." (ECF No. 38-1 at 54.)

[7] The 1991 – 1995 Policies apply "only for loss occurring during the policy period." (ECF No. 42 ¶ 12.)

The parties each retained experts in engineering and concrete analysis to evaluate the condition of the Carlsons' basement walls and investigate the causes of the cracking. The parties do not dispute that the chemical reaction at work in the Carlsons' home was ultimately identified as oxidation of iron sulfide minerals. (*See* ECF No. 41 at 4 n.1.)

The Carlsons retained engineer James L. Silva, who inspected the foundation walls of the Property and authored a report ("the Silva Report"), dated November 17, 2014. (ECF No. 42-4.) The Silva Report states, "[t]he level and type of concrete distress noted during our inspection appears to be consistent with conditions that are usually observed during the incipient stage of a sulfate attack." (ECF No. 42-4 at 5 (emphasis in original).) The Silva Report stated, "[t]he foundation walls appear to have varying levels of gypsum chalking, map cracking, and concrete surface discoloration." (*Id.*) Based on investigations of other residential concrete foundations in Connecticut, Silva noted that, "[i]n general, concrete testing for these similar foundations revealed that the concrete was of a poor quality (low compressive strength and high moisture permeability), which made the concrete susceptible to attack from water-soluble sulfates located in the groundwater or in the backfill material." (*Id.* at 6.) The Silva Report further stated that, "[a]t the time of the inspection, it did not appear that the structural wood framing had been affected by the observed concrete deterioration," and that "there was no indication of movement or displacement of the concrete foundation." (*Id.* at 5.) The Silva Report analyzed several options for the Carlsons. Under "Option 1," "Do Nothing," the report stated, "If no action is taken, the external sulfate attack will continue, and over time, additional concrete deterioration will occur, potentially causing damage to the structural framing system, and/or possible collapse of the foundation." (*Id.* at 7.)

The Carlsons also retained an engineer, David Grandpre. Grandpre conducted an inspection of the Property on July 16, 2015, and authored a report ("the Grandpre Report"), dated October

18, 2016, summarizing his conclusions. (ECF No. 42-4 at 39-81.) The Grandpre Report stated that Grandpre had observed a wall "visibly bowing inward"; a wall that was "displaced upward and outward"; and cracks "similar to concrete shrinkage cracks." (*Id*. at 41.) The Grandpre Report stated that the "concrete was internally fractured, crumbling, and no longer a solid mass." (*Id.*) As a result, Grandpre concluded that the Carlsons' basement walls were "substantially structurally impaired. Cracks formed as the deterioration process progressed, and the concrete weakened." (*Id*. at 42.) In Grandpre's opinion, "the only viable action was to remove the deteriorated concrete basement walls and replace them." (*Id*.) At his deposition, Grandpre testified that the cracking was part of a chemical process he believed to have occurred over a period of years, beginning when the concrete was poured. (ECF No. 42 ¶ 15; ECF No. 38-4 at 42-43.) Grandpre agreed with defense counsel that the process "was not a sudden process." (ECF No. 38-4 at 43.)

Allstate retained structural engineer Brian Aguirre, who inspected the Property on April 21, 2015, and reviewed reports prepared in conjunction with concrete strength tests and petrographic analysis of concrete samples extracted from the Carlsons' home. (*See* ECF No. 42-4 at 12-13, 32-37.) Aguirre authored a report ("the Aguirre Report"), dated June 12, 2015, following his inspection and evaluation of the Property. (*Id*. at 13-31.) The Aguirre Report concluded that "the deterioration of the concrete walls has been a long-term process. Due to the low-strength and high permeability of the concrete, as well as the significant quantity of cracking, deterioration of the foundation walls exposed to the exterior will continue." (*Id*. at 13.)

Allstate also retained a concrete expert, Nick Scaglione. Scaglione authored a report ("the Scaglione Report"), dated July 28, 2016, concerning petrographic analysis of one of the concrete specimens extracted from the Carlsons' foundation. (ECF No. 38-4 at 52-57.) Scaglione confirmed that core samples drilled from the Carlsons' foundation walls contained iron sulfide materials,

7

predominantly pyrrhotite. (ECF No. 42 ¶ 16; ECF No. 38-4 at 55.) The Scaglione Report concluded that "cracking distress [was] judged to be due to the oxidation of iron sulfide minerals (i.e., primarily pyrrhotite $Fe_{1-x}S$) present within some of [the] coarse aggregate particles," and that the "cement paste of the concrete is judged to be poor quality." (ECF No. 38-4 at 56.) The Scaglione Report further stated that "[a] source of water is needed for the iron sulfide minerals to oxidize within the concrete," and that in Scaglione's opinion, "for the cracking distress to have reached the observed levels, a long term exposure to an exterior source of water is necessary." (ECF No. 38-4 at 57.)

Allstate also retained structural engineer Leonard Morse-Fortier. Morse-Fortier stated in his affidavit that, based on the evidence he reviewed, and in particular the Scaglione Report, "the conditions at the Property are the result of long-term progressive deterioration of the foundation walls. This deterioration results from oxidation of pyrrhotite, a reactive iron-sulfide mineral contained in the concrete aggregate." (ECF No. 38-2 at 3.) Morse-Fortier also stated that "[p]yrrhotite was present when the concrete was placed. Over time, when exposed to air and water, pyrrhotite oxidizes and expands, causing cracking." (*Id.*) Morse-Fortier prepared a report ("the Morse-Fortier Report"), dated November 23, 2016, in which he summarized these and other conclusions. (ECF No. 38-2 at 5-16.) However, Morse-Fortier was unable to examine the concrete foundation walls in their pre-removal state, as the Carlsons had already removed and replaced the foundation walls. (*Id.* at 5.) Morse-Fortier's report states that he reviewed the above-mentioned reports, photos accompanying those reports, and deposition transcripts. (*Id.* at 6-11.)

The Carlsons had their concrete basement walls removed and replaced in late 2015. (ECF No. 38-4 at 19.) The Carlsons testified at each of their depositions that they did not take issue with

any conduct by Allstate other than the denial of their claim. (ECF No. 42 ¶ 17; ECF No. 38-4 at 17, 32-33.)

## II. Legal Standards

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014) (internal quotation marks and citations omitted). "In making that determination, a court must view the evidence in the light most favorable to the opposing party." *Id.* (quotation marks omitted). On summary judgment a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Phillip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25 (1986). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.,* 654 F.3d 347, 358 (2d Cir. 2011).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). "A party opposing summary judgment cannot defeat the motion by relying on the allegations in [the] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. At the summary judgment stage of the proceeding, plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not

sufficient." *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01150 (VLB), 2017 WL 706559, at *4 (D. Conn. Feb. 21, 2017).

The proper construction of an insurance policy is a question of law. *R.T. Vanderbilt Co., Inc. v. Hartford Accident & Indemnity Co.*, 171 Conn. App. 61, 93 (2017). "An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Connecticut Medical Ins. Co. v. Kulikowski,* 286 Conn. 1, 5 (2008) (citation and quotation marks omitted).

> If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning…. When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result…. As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.

*Id.* at 5-6 (citations, quotation marks, and alterations omitted).

"The insured bears the burden of establishing coverage." *Harleysville Worcester Ins. Co. v. Paramount Concrete, Inc.*, 10 F. Supp. 3d 252, 259 (D. Conn. 2014). "The burden of proving that an exclusion applies is on the insurer, but the insured has the burden of proving that an exception to an exclusion reinstates coverage." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 788 n.24 (2013).

### III. Discussion

#### A. Breach of Contract

The Carlsons argue that Allstate is liable for breach of contract because it failed to cover losses as set forth in the Policy. Specifically, the Carlsons argue that they are entitled to collapse coverage because "the concrete walls of the basement of the Carlsons' home have decayed and

10

broken apart" such that they are "substantially structurally impaired." (ECF No. 41 at 7.) The Carlsons argue further that because the claimed "structural[] fail[ure]" of portions of the basement walls was caused by oxidation of iron sulfide materials, the Carlsons are entitled to coverage because the claimed "collapse" is caused by "[h]idden decay of the building structure" or "[u]se of defective materials in construction, repair, remodeling or renovation," and collapses caused by such events are covered by the Policies. (*Id*. at 8.)

In support of this position, the Carlsons rely on the Connecticut Supreme Court's decision in *Beach v. Middlesex Mut. Assur. Co.*, 205 Conn. 246, 253 (1987). (ECF No. 41 at 9.) In *Beach*, the Court found that where the insurance policy at issue did not define the term "collapse," the term could reasonably be interpreted to include "a substantial impairment of the structural integrity of a building," in addition to an event of "a sudden and catastrophic nature." *Beach*, 205 Conn. at 252-53. "If the defendant [insurer] wished to rely on a single facial meaning of the term 'collapse' as used in its policy, it had the opportunity expressly to define the term to provide for the limited usage it now claims to have intended." *Id.* at 251. The Court also rejected the defendant's argument that the policy's exclusion for loss by "settling, cracking, shrinkage, bulging or expansion" meant that, when read in the context of the policy as a whole, the term "collapse" necessarily connoted a sudden catastrophe:

> Nowhere does the policy express a clear unambiguous intent to exclude coverage for a catastrophe that subsequently develops out of a loss that appeared, at its inception, to fall within the rubric of 'settling, cracking, shrinkage, bulging or expansion.' . . . . Read in its entirety, . . . the defendant's policy does not unambiguously limit its liability to a 'collapse' of a sudden and catastrophic nature.

*Id*. at 251-52.

The Carlsons argue that the *Beach* Court's interpretation of "collapse" applies here, as Allstate similarly left "collapse" undefined in the Policies, and that this likewise means that the

11

exclusion for losses consisting of or caused by "settling, cracking, shrinking, bulging, or expansion" is not a barrier to coverage. (ECF No. 41 at 10.) This argument fails, however, because the Allstate Policies "provide for the limited usage," 205 Conn. at 251, of "collapse" that was missing in *Beach*. While the Policies do not define the term "collapse" itself, they qualify the types of losses that will be considered *covered* collapses. Most importantly for purposes of distinguishing *Beach* and the cases that rely on it, the Policies make clear that "[f]or coverage to apply, the collapse . . . must be a sudden and accidental direct physical loss . . . ." (ECF No. 38-1 at 20); *see also Bacewicz v. NGM Ins. Co.*, No. 3:08-CV-1530 (JCH), 2010 WL 3023882, at *6 (D. Conn. Aug. 2, 2010) (denying summary judgment because a reasonable jury could find that a "collapse" occurred within the meaning of the plaintiffs' policy, where "collapse" was undefined and the policy contained no requirement of suddenness); *Belz v. Peerless Ins. Co.*, 204 F. Supp. 3d 457, 463-64 (D. Conn. 2016) (denying summary judgment where policy contained no suddenness requirement for covered losses); *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 114-16 (D. Conn. 2014) (denying motion to dismiss where policy contained no suddenness requirement for covered losses). The *Bacewicz* Court highlighted the key distinction between that case and one involving a claim like the Carlsons' by noting that if the insurer in that case "had intended to limit collapse coverage to situations involving sudden and catastrophic loss, it presumably could have done so." *Bacewicz*, 2010 WL 3023882, at *5. Unlike in *Beach* and its progeny, the Policies here unambiguously express an intent to limit coverage to "sudden and accidental" collapses. Thus, the alternative definition of "collapse" formulated in *Beach*—*a* "substantial structural impairment"— does not apply here.

The Carlsons next argue that the use of the term "sudden" is ambiguous in the context of the collapse coverage provision. In the context of an insurance policy involving "sudden and

12

accidental" pollution, the Connecticut Supreme Court held that "sudden" included a "temporal quality, which requires that the onset of the release in question occurs quickly or happens abruptly." *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 536 (2002). The Court, reviewing dictionary definitions, "acknowledge[d] that, the word sudden can be used to describe the *unexpected nature*, as well as *abrupt onset*, of the event being described." *Id*. at 540 (emphasis added). But it concluded that in the context of the phrase "sudden and accidental," because "accidental" already included an element of unexpectedness, "sudden" had to be accorded a temporal element to avoid rendering it mere surplusage. *Id*. at 540-41.

Following the logic of *Buell*, courts have ruled in favor of insurance companies in concrete decay cases where insurance policies require "sudden and accidental" losses, or otherwise contain language requiring that the loss be temporally abrupt, including in cases involving the policy language at issue here. *See, e.g.*, *Adams v. Allstate Ins. Co.*, No. 3:16-CV-1360 (JBA), 2017 WL 3763837, at *4 (D. Conn. Aug. 29, 2017) (granting motion to dismiss where policy required a "sudden and accidental direct physical loss"); *Clough v. Allstate Ins. Co.*, No. 3:17-CV-140 (JBA), 2017 WL 3763841, at *5 (D. Conn. Aug. 29, 2017) (granting motion to dismiss where policy required a "sudden and accidental direct physical loss"); *Miller v. Allstate Ins. Co.*, No. 3:16-CV-2059 (JBA), 2017 WL 3763425, at *4 (D. Conn. Aug. 29, 2017) (granting motion to dismiss where policy required a "sudden and accidental direct physical loss"); *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-1150 (VLB), 2017 WL 706599, at *7 (D. Conn. Feb. 21, 2017) (granting motion for summary judgment where policy required a "sudden and accidental direct physical loss"); *Alexander v. General Ins. Co. of America*, No. 3:16-CV-59 (SRU), transcript of oral ruling, ECF No. 22 at 23 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "abrupt falling down or caving in"); *Jemiola v. Hartford Cas. Ins. Co.*, No. CV-15-

6008837-S, 2017 WL 1258778, at *1 (Conn. Super. Ct. Mar. 2, 2017) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in"); *Toomey v. Central Mut. Ins. Co.*, Docket No. CV-15-6009841-S (Conn. Super. Ct. Aug. 3, 2017) (unpublished) (granting summary judgment where policy defined collapse as "an abrupt falling down or caving in"). I reach the same conclusion here: "sudden," as used in the phrase "the collapse of a building structure . . . must be a sudden and accidental direct physical loss," unambiguously refers to a temporally abrupt event.

The Carlsons also argue that the term "sudden" is ambiguous because certain of the covered causes of collapse, such as "hidden decay" and "hidden insect infestation," occur gradually. (ECF No. 41 at 14-15.) In support of this position, the Carlsons urge the Court to adopt the reasoning used in *Kelly v. Balboa Ins. Co.*, 897 F. Supp. 2d 1262, 1268 (M.D. Fla. 2012) (denying summary judgment, in part by finding that the inclusion of "sudden" in the definition of "loss" in a policy that covers insect damage rendered the provision ambiguous). I decline to do so, following instead the reasoning employed by other courts in this District. As the Court in *Alexander* reasoned, the Carlsons are seeking coverage for an alleged collapse, not decay. The Policies unambiguously afford coverage once the specified hidden processes, such as decay or insect infestation, result in a sudden and accidental collapse.[8] *See Alexander v. General Ins. Co. of America*, No. 3:16-cv-59, transcript of oral ruling, ECF No. 22 at 13-14 (D. Conn. July 7, 2016); *see also Metsack v. Liberty Mut. Fire Ins. Co.*, No. 14-cv-1150 (VLB), 2017 WL 706599, at *7 (D. Conn. Feb. 21, 2017) ("'Hidden decay' and 'hidden damage to the building structure caused by insects or vermin' can

---

[8] Relying on *Beach*, the Carlsons argue that "requiring an insured to wait for a sudden or catastrophic falling down would be 'economically wasteful,' to say nothing of the potential for injury or death resulting from such a calamity." (ECF No. 41 at 13 (quoting *Beach*, 205 Conn. at 252).) While this argument may have merit, it is a policy argument, and does not bear on the question of contract interpretation before the Court.

cause a collapse that an insured would perceive as 'sudden' if the decay or infestation were truly hidden from the insured's view."). That the Policies acknowledge that sudden collapses may result from hidden, gradual processes does not render them ambiguous.

Because the term "sudden," as used in the collapse coverage provision, means temporally abrupt, the Carlsons must point to evidence that the loss for which they seek coverage occurred abruptly, and not merely unexpectedly, for it to be a covered collapse.

Here, the parties do not dispute that the process leading to the cracking of the Carlsons' basement walls occurred gradually. (*See* ECF No. 41 at 12 ("There is little doubt that the chemical reaction that caused the damage to the Carlsons' home occurs over years and is gradual in nature.").) All of the retained experts have opined that the process has occurred or will continue to occur over a period of years. (*See* ECF No. 42-4 at 7 (opinion of the Carlsons' retained engineer Silva that "[i]f no action is taken, the external sulfate attack will continue, and over time, additional concrete deterioration will occur, potentially causing damage to the structural framing system, and/or possible collapse of the foundation"); ECF No. 38-4 at 42-43 (testimony of the Carlsons' engineering expert Grandpre regarding his belief that the cracking was part of a chemical process that occurred over a period of years commencing with the initial pouring of the concrete); ECF No. 42-4 at 13 (opinion of Allstate's retained engineer Aguirre that "the deterioration of the concrete walls has been a long-term process"); ECF No. 38-4 at 57 (opinion of Allstate's retained concrete expert Scaglione that "for the cracking distress to have reached the observed levels, a long term exposure to an exterior source of water is necessary"); ECF No. 38-2 at 3 (opinion of Allstate's retained engineer Morse-Fortier that "the conditions at the Property are the result of long-term progressive deterioration of the foundation walls").

15

Despite the overall agreement among the parties' experts, the Carlsons argue that "the gradual reaction can cause sudden events throughout the course of the deterioration," and that "the record suggests that such sudden events had occurred in the Carlsons' home, in that the pieces of concrete had fallen to the floor and, more significantly, that more than one wall had shifted inward by some increment." (ECF No. 41 at 12.) In support of this argument, they point to the opinions of their engineering expert, Grandpre, who provided the following testimony at his deposition:

> Q: So that's a process that's been occurring over the 25 years?
> A: Yes.
> Q: So it's not a sudden process?
> A: Correct.
> Q: Could the process result in a – it's a gradual process, right?
> A: Yes.
> Q: Could the gradual process result in a sudden event somewhere down the road?
> A: Yes.
> Q: What sudden event *might* that be?
> A: Sudden event such as the wall going from being straight and plumb to shifting inward some increment, or to pieces of the concrete within the wall falling to the floor.

(ECF No. 42-5 at 13 (emphasis added).) But the only evidence of such a "sudden" event actually occurring in the Carlsons' home that Grandpre testified he observed was cracking—which is unambiguously excluded from coverage under a separate restriction on covered collapses set forth in the Policies: "Collapse does not include settling, cracking, shrinking, bulging or expansion." (ECF No. 42 ¶ 14; *see also* ECF No. 42 ¶¶ 9-10 ("we do not cover loss consisting of or caused by . . . settling, cracking, shrinking, bulging or expansion of . . . foundations [and] walls. . . .").) Specifically, Grandpre testified that he observed "evidence that pieces of concrete are falling from the wall" from photographs showing "the classic map pattern cracking and expansion, opening up of these cracks, and where three cracks intersect, . . . a void . . . represented by some missing concrete that has fallen from the wall." (ECF No. 42-5 at 13.) While the falling pieces of concrete, according to Grandpre, might constitute a "sudden" event, they do not amount to a covered loss

16

under the Policies, because they are caused by cracking. (*See* ECF No. 42 ¶¶ 9-10 ("we do not cover loss consisting of or caused by . . . cracking . . . of . . . walls . . . .").) The Grandpre Report also states that he observed conditions that resembled the second type of "sudden" event that he said might result from the gradual process of concrete deterioration: "using a plumb bob I determined that the wall was bulging inward about one and an eighth inch." (ECF No. 42-4 at 41; ECF No. 42-5 at 14.) But the Grandpre Report does not suggest that such bulging had in fact occurred suddenly, and his deposition testimony does not suggest that all events involving a wall "going from being straight and plumb to shifting inward some increment" happen suddenly. In any event, "bulging" and "expansion" are also expressly excluded from collapse coverage. Thus, even if the bulging and expansion of the wall that he observed were sudden, they do not constitute a collapse under the clear language of the Policies.

Even when the process of deterioration that is causing damage to the Carlsons' home—which both sides acknowledge is a gradual one—is broken into micro-events, those micro-events do not constitute a covered "collapse" if, as in this case, they amount to no more than settling, cracking, shrinking, bulging or expansion. Because the Carlsons point to no evidence in the record that the damage to their home was *both* sudden *and* something other than settling, cracking, shrinking, bulging, or expansion, they are not entitled to collapse coverage under the Policies.

Finally, the Carlsons also cannot meet an additional requirement for collapse coverage—that the loss be "(a) the *entire collapse* of a covered building structure; (b) the *entire collapse* of part of a covered building structure; [or] direct physical loss to covered property caused by (a) or (b) above," (ECF No. 42 ¶ 14; ECF No. 38-1 at 20 (emphasis added)). No reasonable juror could find that "pieces of the concrete within the wall falling to the floor" from gaps left by cracks or a "wall going from straight and plumb to shifting inward some increment" means that an "entire

collapse" has occurred. *See Agosti v. Merrimack Mut. Fire Ins. Co.*, 3:16-cv-01686 (SRU), 2017 WL 3710786, at *6-7 (D. Conn. Aug. 28, 2017). In each case, the wall was still standing and, as Grandpre acknowledged, the Carlsons' residence was, when he visited, suitable for continued occupancy, not characterized by a safety hazard, and "not about to fall down to the basement floor." (ECF No. 42-5 at 14.).[9] Especially when read in light of the language making clear that collapse is *not* mere "settling, cracking, shrinking, bulging, or expansion," the phrase "entire collapse" must mean something more cataclysmic than the conditions Grandpre observed.

Because I find that the Policies unambiguously exclude coverage for the Carlsons' alleged loss, I GRANT summary judgment on the breach of contract claim.

**B. Breach of Implied Covenant of Good Faith and Fair Dealing**

The Carlsons also claim that Allstate is liable for breach of the implied covenant of good faith and fair dealing. "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement. In other words, every contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *De La Concha of Hartford, Inc. v. Aetna Life Ins. Co.*, 269 Conn. 424, 432 (2004) (internal citations, quotation marks, and alterations omitted).

"To constitute a breach of the implied covenant of good faith and fair dealing, the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith." *Capstone Bldg. Corp. v. Am. Motorists Ins. Co.*, 308 Conn. 760, 794–95 (2013) (alterations omitted). In the context of an insurance policy, "violations of express duties are necessary to maintain a bad faith

---

[9] Although the 1991 – 1995 Policies also provide coverage for "partial collapse," those policies require the bringing of suit "within one year after the date of loss," which would presumably make them inapplicable here. (ECF No. 38-1 at 59.)

cause of action." *Id.* at 797. As a result, the implied covenant of good faith and fair dealing "is not implicated by conduct that does not impair contractual rights." *Id*. at 795. Because I find that the Carlsons fail to provide evidence to support a claim for breach of contract against Allstate, and therefore that Allstate's conduct did not impair the Carlsons' contractual rights under the Policies, the Carlsons' claim for breach of the implied covenant of good faith and fair dealing also fails.

### C. CUIPA/CUTPA

Finally, the Carlsons also claim that Allstate violated CUIPA and CUTPA. Where the claim is premised on denial of coverage under an insurance policy and the insurer's interpretation of the policy is correct, there can be no violation of CUIPA/CUTPA. *Zulick v. Patrons Mut. Ins. Co.*, 287 Conn. 367, 378 (2008) (affirming dismissal of CUIPA/CUTPA claim after determining that defendant insurer's interpretation of an insurance policy was correct). Because I find that Allstate's interpretation of the Policies was correct, the Carlsons' CUIPA/CUTPA claim necessarily fails.

## IV. Conclusion

For the reasons stated above, Allstate's Motion for Summary Judgment is GRANTED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
September 27, 2017